NO CV30

CARL A. WESCOTT
8210 E. Via de la Escuela
Scottsdale, AZ 85258
*in propria persona*
+1 276 773 7377



FILED
CLERK, U.S. DISTRICT COURT

JAN 1 6 2024

CENTRAL DISTRICT OF CALIFORNIA
BY ___ EEE ___ DEPUTY

# UNITED STATES DISTRICT COURT

## DISTRICT OF CALIFORNIA

8:24-cv-00092-CJC-JDEx

| | |
|---|---|
| CARL A. WESCOTT, | Civil Action No. _____ |
| Plaintiff, | **PLAINTIFF'S VERIFIED LEGAL COMPLAINT FOR BREACH OF CONTRACT; EQUITABLE ESTOPPEL; BAD FAITH DENIAL OF INSURANCE CLAIM; and DECEPTIVE PRACTICES;** |
| vs. | |
| FIRST AMERICAN TITLE INSURANCE COMPANY, | |
| FIRST AMERICAN FINANCIAL CORP. | |
| Defendants. | |
| + DOES 1 through 10 | |

Plaintiff Carl A. Wescott, proceeding *pro se,* and using the assigned legal claims of his company Side Coast, SA ("Side Coast") complains of Defendants First American Title Insurance Company ("First American Title") and First American Financial Corporation, and in support of his complaint, the Plaintiff states as follows.

### The Parties: Plaintiff and Defendants

1. Carl Wescott is an individual presently residing in Scottsdale, Arizona, who is using the assigned legal claims of Side Coast (Exhibit A).

**PLAINTIFF'S VERIFIED LEGAL COMPLAINT FOR BREACH OF CONTRACT; EQUITABLE ESTOPPEL; BAD FAITH DENIAL OF INSURANCE CLAIM; and DECEPTIVE PRACTICES;**

2. Side Coast is a company in Nicaragua that owned the Montecristo development. Montecristo is a residential development with over one thousand (1000) properties in six neighborhoods along the Nicaragua Coast, with over 8 km of beach and coastline. Mr. Wescott purchased Side Coast in 2015. Side Coast had already previously purchased four title insurance policies from First American Title inuring to the benefit of Side Coast.

3. To differentiate between Carl Wescott, the Plaintiff ("the Plaintiff") with the assigned legal claims of legal person Side Coast, and Carl Wescott, the individual, "Carl Wescott" shall refer to the natural person Carl Wescott.

4. Defendant First American Financial Corporation is a Delaware Corporation with its principal executive offices and corporate headquarters located at 1 First American Way, Santa Ana, California. First American Financial Corporation is a citizen of the States of Delaware and California. First American Financial Corporation conducts business throughout California, the United States, and the world. First American Financial Corporation shares its subsidiary's liability.

5. First American Title Insurance Company ("First American Title") is a wholly-owned subsidiary of First American Financial Corporation with its executive headquarters in Santa Ana California and its commercial underwriting headquarters established at 4909 S. 135th Street Omaha Nebraska 68137. First American Title is thus a citizen of the States of Nebraska as well as California and conducts business throughout the United States and the world.

**Other Relevant Parties**

6. Mr. Bobby Ashravi, esq. is a Partner at Dillon Miller Ahula & Boss, LLP ("Dillon Miller"), in

2

**PLAINTIFF'S VERIFIED LEGAL COMPLAINT FOR BREACH OF CONTRACT; EQUITABLE ESTOPPEL; BAD FAITH DENIAL OF INSURANCE CLAIM; and DECEPTIVE PRACTICES;**

Carlsbad, California, who handled the Plaintiff's title insurance claims on behalf of Dillon Miller client First American Title.

7. Ms. Turalu Murdock was the senior executive in charge of First American Title's Latin American operations. Ms. Murdock was based in Nicaragua and also lived in the Montecristo development.

**Allegations regarding conspiracy between defendants**

8. Plaintiff alleges on information and belief that the acts of each of the Defendants were fully ratified by each and all of the other Defendants.

9. Specifically, and without limitation, Plaintiff alleges on information and belief that the tortious actions, failures to act, breaches, and negligence alleged herein and attributed to one or more of the specific Defendants were approved, ratified, and/or done with the cooperation and knowledge of each and in conspiracy with all other Defendants (individual and corporate).

10. In addition, upon information and belief, there are nefarious corporate, trust, and other entity type Defendants involved in these conspiracies, currently unknown to Plaintiff. They shall emerge with the benefit of legal discovery.

11. Plaintiff is informed and believes and thereon alleges that at all times material to this Complaint, any and all such corporate entities, in addition to acting for itself and for its own behalf, was acting as the agent, servant, and/or representative of, and with the knowledge, consent, and permission of, and in conspiracy with, each and all of the Defendants (entity and individual) and within the course, scope, and authority of that agency, service, employment, representation, and conspiracy.

3

**PLAINTIFF'S VERIFIED LEGAL COMPLAINT FOR BREACH OF CONTRACT; EQUITABLE ESTOPPEL; BAD FAITH DENIAL OF INSURANCE CLAIM; and DECEPTIVE PRACTICES;**

12. Plaintiff further alleges on information and belief that the acts of each of the Defendants were fully ratified by each and all of the Defendants. Specifically, and without limitation, Plaintiff alleges on information and belief that the tortious actions, failures to act, breaches, and negligence alleged herein and attributed to one or more of the specific Defendants were approved, ratified, and/or done with the cooperation and knowledge of each and in conspiracy with all other Defendants (individual and corporate).

**Jurisdiction, Venue, and Choices of Law**

13. Though First American Title ("FATI") also has *indicia* and a significant presence in Nebraska, FATI policies state that California law as well as the applicable laws of where the relevant land is located are the choices of law for any disputes.

14. The FATI title policies also state that any lawsuit suing FATI and its parent company must occur in a California Court.

15. Since the Defendants are domiciled in California with their headquarters in Santa Ana, this Court can assert jurisdiction over these Defendants.

16. This is an action for damages pursuant to 28 U.S.C. § 1332 based on diversity of citizenship and a claim for damages greater than US $75,000. Alleged damages are explained in further detail below as they are critical to this Court establishing subject-matter jurisdiction.

17. Supplemental jurisdiction over the Plaintiff's California state law claims is pursuant to 28 U.S.C. § 1367.

4

**PLAINTIFF'S VERIFIED LEGAL COMPLAINT FOR BREACH OF CONTRACT; EQUITABLE ESTOPPEL; BAD FAITH DENIAL OF INSURANCE CLAIM; and DECEPTIVE PRACTICES;**

**Subject-Matter Jurisdiction – Background and Legal Standards**

18. With damages of $75,000 and the diversity of citizenship of Plaintiff and Defendants, the Plaintiff would qualify for United States District Court under 28 U.S. Code § 1332(a)(1):

> DIVERSITY OF CITIZENSHIP; AMOUNT IN CONTROVERSY; COSTS
>
> **(a)**The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between—
>> **(1)** citizens of different States;   *(28 U.S. Code § 1332 (a)(1))*

19. The Plaintiff resides in Arizona and the Defendants are citizens of California.

20. Thus, the parties have complete diversity of citizenship.

21. The Plaintiff will add the facts, logic, and reasoning supporting the Plaintiff's thinking that his recoverable damages will be greater than US $75,000.

22. To qualify for federal court under complete diversity of citizenship, the amount in controversy must exceed the sum or value of $75,000, exclusive of interest and costs (*28 U.S.C. § 1332(a) (2014)*).

23. The determination of the amount in controversy for federal subject matter jurisdiction is an issue decided under federal law.  14AA FEDERAL PRACTICE AND PROCEDURE § 3702 (4th ed. 2014) [hereinafter "FEDERAL PRACTICE"]. See *Horton v. Liberty Mut. Ins. Co.*, 367 U.S. 348, 352 (1961).

24. Federal courts will, however, look to applicable state law to determine the nature of the plaintiff's substantive claim and related damages. FEDERAL PRACTICE § 3702. See *Horton*, 367 U.S. at 352-353.

**PLAINTIFF'S VERIFIED LEGAL COMPLAINT FOR BREACH OF CONTRACT; EQUITABLE ESTOPPEL; BAD FAITH DENIAL OF INSURANCE CLAIM; and DECEPTIVE PRACTICES;**

25. Numerous courts, including the United States Supreme Court have held that the amount in controversy for jurisdictional purposes is measured by the direct pecuniary value of the right that the plaintiff seeks to enforce or the value of the object that is the subject matter of the suit. FEDERAL PRACTICE § 3702.5. See *Hunt v. Washington State Apple Advertising Com'n*, 432 U.S. 333, 97 S.Ct. 2434, 53 L. Ed. 1067 (1947).

26. The direct pecuniary value of the right is simply an estimate of the total amount in dispute rather than an assessment of liability. *Lewis v. Verizon Communications, Inc.*, 627 F.3d 395, 400 (9th Cir. 2010).

27. The amount in controversy is determined without considering accrued or accruing interest or the costs associated with the lawsuit. *(28 U.S.C. § 1332(b))*

28. Courts have held that collateral effects will not be taken into account when calculating the amount in controversy. FEDERAL PRACTICE § 3702.5. See *Healy v. Ratta*, 292 U.S. 263, 267 (1934) ("the collateral effects of the decree, by virtue of stare decisis, upon other and distinct controversies, may not be considered in ascertaining whether the jurisdictional amount is involved, even though their decision turns on the same question of law."). See also *New England Mortg. Sec. Co. v. Gay*, 145 U.S. 123, 130 (1892) ("It is well settled in this court that, when our jurisdiction depends upon the amount in controversy, it is determined by the amount involved in the particular case, and not by any contingent loss either one of the parties may sustain by the probative effect of the judgment, however certain it may be that such loss will occur.").

29. The amount in controversy may include compensatory damages including general and special damages such as pain and suffering and out of pocket loss. The amount in controversy may also

6

**PLAINTIFF'S VERIFIED LEGAL COMPLAINT FOR BREACH OF CONTRACT; EQUITABLE ESTOPPEL; BAD FAITH DENIAL OF INSURANCE CLAIM; and DECEPTIVE PRACTICES;**

include punitive damages. *Anthony v. Security Pac. Fin. Servs., Inc.*, 75 F.3d 311, 315 (7th Cir. 1996); *Watson v. Blankinship*, 20 F.3d 383, 386-387 (10th Cir. 1994).

30. When there is direct legal authority, by statute or contract, for the recovery of attorneys' fees, then the fee claim may be included in determining the amount in controversy regardless of whether the award of fees is mandatory or discretionary. *Galt G/S v. JSS Scandinavia*, 142 F.3d 1150, 155-1156 (9th Cir. 1998).

## **Subject-Matter Jurisdiction with the Alleged Facts of this Particular Case**

31. The Plaintiff plans to get an attorney for this case in the future, but luckily does not need the attorney fees that the Plaintiff can collect by virtue of Defendants' breaches of contract in his calculations of damages to qualify for subject-matter jurisdiction.

32. The Plaintiff has sustained damages of $3.6 million in Defendants' denial of their duty to indemnify, alone, and much larger damages (more than US $18 million) from other aspects of his claims including FATI's breach of the duty to defend, especially given the bad faith exhibited herein.

33. Thus, the Plaintiff's base damages (arguably $18 million, and certainly the policy limits of $3.6 million combined across the four relevant title insurance policies) far exceed the threshold ($75,000) for federal subject-matter jurisdiction.

**PLAINTIFF'S VERIFIED LEGAL COMPLAINT FOR BREACH OF CONTRACT; EQUITABLE ESTOPPEL; BAD FAITH DENIAL OF INSURANCE CLAIM; and DECEPTIVE PRACTICES;**

**Bob Block Criminal Gang Impact**

1.  Before the narrative and allegations setting out the facts in this case, the Plaintiff must note that a criminal gang (the Bob Block Criminal Gang) SIM-hacked the Plaintiff and took over his cell phones, email addresses and laptops, shutting him out.

2.  The Plaintiff is working to recover those emails and documents will issue subpoenas to Google and other service providers to get information. At present, however, the Plaintiff is writing this narrative without the benefit of those emails and his documents.

3.  The Plaintiff got in touch with First American Title and its attorney on multiple occasions to recover relevant documents, beginning in December 2023 before Christmas. The Plaintiff has promises for the information and expects to get it soon, but as of Friday, January 11th, 2024, he does not have the information promised from First American Title or its attorney.

4.  Obviously, the Plaintiff can serve discovery in this case to get the rest of what he needs for his jury trial.

5.  The Plaintiff plans to supplement and amend his legal complaint with further information when he has his emails and documents, including all of the currently missing exhibits, such as the four relevant title insurance policies.

6.  Relatedly, the leader of the Block Criminal Gang, Mr. Robert J. Block, also stole the Plaintiff's birth certificate and identity.

7.  Mr. Block, a disbarred former attorney who turned to a life of crime after he became homeless, also has been interfering with the Plaintiff's legal cases in multiple ways, including interfering with the Plaintiff's filings and correspondence.

**PLAINTIFF'S VERIFIED LEGAL COMPLAINT FOR BREACH OF CONTRACT; EQUITABLE ESTOPPEL; BAD FAITH DENIAL OF INSURANCE CLAIM; and DECEPTIVE PRACTICES;**

8. Mr. Block has also been contacting Defendants pretending to be "Carl Wescott" and attempting to negotiate settlements on his behalf, asking money to be sent to "Carl Wescott" bank accounts that he controls.

9. Finally, Mr. Block has threatened to further interfere with the Plaintiff's legal cases, including by forging the Plaintiff's signature and filling false forged dismissals.

10. The Plaintiff mentions all this here hoping Mr. Block will not interfere with this case, but so the Court knows this background.

### Carl Wescott Discovers Montecristo in Nicaragua and his First Failed Attempt to Purchase

11. Carl Wescott has a background in real estate, starting when he bought over seventy (70) residential properties in California in the 1990s and early 2000s as investments and for clients and remodeled many of those.

12. Subsequently, Carl Wescott became a residential developer in various countries in Latin America, including Ecuador, Uruguay, Honduras, Guatemala, Panama, and Nicaragua, from 2004 until his bankruptcy in 2012.

13. The Plaintiff went to Nicaragua on Saturday, February 28th, 2015, and found the ultimate distressed real estate opportunity, Montecristo.

14. It was distressed not because of issues with the land but because of issues with its beneficial owners, Jorge and Lori Estrada.

15. The Estradas were not available to meet with the Plaintiff on the day that the Plaintiff was in Nicaragua.

9

**PLAINTIFF'S VERIFIED LEGAL COMPLAINT FOR BREACH OF CONTRACT; EQUITABLE ESTOPPEL; BAD FAITH DENIAL OF INSURANCE CLAIM; and DECEPTIVE PRACTICES;**

16.     However, the Plaintiff found two people, at least one of whom owned property at Montecristo
(Jaime Avila), who were real estate brokers, who agreed to help the Plaintiff purchase the property.

17.     Mr. Avila and Mr. Daniel Otazo (the second broker, soon to be CEO of a Nicaraguan bank)
agreed to be the Plaintiff's real estate brokers.

18.     The Plaintiff wished to purchase a title insurance Master Policy as part of the transaction, of
course, and my real estate brokers recommended the Plaintiff consider Mr. Sergio Arguello Pereyra
as my attorney due to his real estate expertise.

19.     The Plaintiff hired Mr. Arguello Pereyra as his attorney partially because Mr. Pereyra had
been vetted by First American Title and was on First American Title's short list of recommended
attorneys in Managua, who could do title research for a First American Title title insurance policy.

20.     As it turns out, the company that owned Montecristo, Side Coast Inc., SA ("Side Coast"),
already had purchased title insurance Master Policies from First American Title, so the Plaintiff
elected to purchase the Side Coast company (Sociedad Anonima) instead of the land, to keep the title
insurance Master Policies intact.

21.     The Plaintiff felt comfortable with the transaction partially because of Mr. Arguello Pereyra.
the Plaintiff also felt comfortable with the real estate brokers partially because the Plaintiff had a
seasoned, senior real estate expert First-American-Title-vetted attorney to protect his interests.

22.     As part of the transaction the first time the Plaintiff entered into contract to purchase
Montecristo, the Plaintiff provided my real estate brokers a refundable US $100,000 good faith
deposit that was supposed to go to the sellers.

23.     The Plaintiff paid Mr. Arguello Pereyra US $6,250 for legal fees to put the first Montecristo
transaction together, which consisted of two contracts.

**PLAINTIFF'S VERIFIED LEGAL COMPLAINT FOR BREACH OF CONTRACT; EQUITABLE
ESTOPPEL; BAD FAITH DENIAL OF INSURANCE CLAIM; and DECEPTIVE PRACTICES;**

24.    The Plaintiff's real estate brokers, Mr. Avila and Mr. Otazo, told him they were owed US $600,000 by the Estradas when they were discussing compensation and representation.

25.    Mr. Avila and Mr. Otazo then assured the Plaintiff that they were not seek nor receive compensation from the sellers and would do the work to represent the Plaintiff and my interests as buy-side real estate broker-agents.

26.    Mr. Avila lived in Montecristo, at a house on the beach, as he told the Plaintiff, and Mr. Avila had a personal vested interest in keeping Montecristo stable and viable.

27.    Mr. Avila and Mr. Otazo ("the Coastline brokers") further proposed that they would represent the Plaintiff as brokers and ensure the transaction with the Plaitniff's entity as buyer was completed, without compensation.

28.    The Coastline Brokers simply wished to ensure that the $600,000 that the Estradas owed them was paid back to them.

29.    The Plaintiff agreed to pay the $600,000 the Coastline brokers were owed in a series of payments within about a year after the close of his purchase of Montecristo.

30.    The Plaintiff knew he would have over US $20 million in equity once his purchase closed, so the Plaintiff figured he would just take a loan against the property (a First Mortgage) after the close.

31.    However, when the Plaintiff talked to the Estradas while in escrow, they were shocked/surprised by the claim that they owed US $600,000 and strongly denied "such nonsense".

32.    The Plaintiff went back to the Coastline brokers and asked them what the debt was for.

33.    This was in an in-person meeting and the Coastline brokers looked surprised and couldn't come up with an answer as to what the $600,000 that they were owed was for.

11
**PLAINTIFF'S VERIFIED LEGAL COMPLAINT FOR BREACH OF CONTRACT; EQUITABLE ESTOPPEL; BAD FAITH DENIAL OF INSURANCE CLAIM; and DECEPTIVE PRACTICES;**

34.    The Plaintiff asked for some sort of documentation about the US $600,000, which the Coastline brokers told him they could not provide.

35.    At that point, the Plaintiff realized his brokers were lying to him.

36.    The Plaintiff didn't want to pay $600,000 based on fraud, and the Plaintiff didn't want fraudsters/liars to be representing him as real estate brokers, so the Plaintiff pulled out of the purchase while still doing due diligence.

37.    The Plaintiff had a general contingency to do so while conducting due diligence.

38.    The Coastline brokers and the Estradas and the Plaintiff all agreed that his purchase was then cancelled due to issues in due diligence.

39.    The Coastline brokers promised in writing that they would refund his $100,000 refundable deposit. (Ironically, in the email promising to return the funds, Mr. Daniel Otazo said he would have returned it anyways even if it wasn't refundable because he is a gentleman and that is the sort of person he and Mr. Jaime Avila were/are).

**The Plaintiff Successfully Purchases Montecristo**

40.    A few days later Jorge Estrada called the Plaintiff to ask why he had pulled out of the transaction.

41.    The Estradas told the Plaintiff they were still interested in selling Montecristo.

42.    The Plaintiff took the redeye to Managua that night and arranged to buy Montecristo directly the following day.

43.    (This was the second time that the Plaintiff entered into contract to purchase Montecristo.

44.    The Plaintiff was able to close the deal about three (3) months later, in August 2015.

**PLAINTIFF'S VERIFIED LEGAL COMPLAINT FOR BREACH OF CONTRACT; EQUITABLE ESTOPPEL; BAD FAITH DENIAL OF INSURANCE CLAIM; and DECEPTIVE PRACTICES;**

45.     The was getting the runaround from the Coastline brokers on my refundable $100k so the Plaintiff called my attorney, Mr. Arguello Pereyra, to get his help.  Mr. Arguello Pereyra then informed me that he represented the Coastline brokers and the Plaintiff wasn't going to get my money back.

46.     Essentially, my own attorney, who should have been representing my interests, was then a legal adversary.  the Plaintiff think there's a chance he was the attorney for the Coastline brokers **before** he allegedly became my attorney, in a scheme to defraud me.

47.     Though I'm more concerned about the loss of Montecristo, once Mr. Arguello Pereyra informed me he represented the Coastline brokers, the Plaintiff sent him a nasty-gram (email) asking for my $6250 back.

48.     Mr. Arguello Pereyra's response, including to my new attorney Mr. Camilo Bendana, was that he was going to use his connections to have me imprisoned if the Plaintiff ever visited Nicaragua again. (This is the person the Plaintiff hired as my attorney!).

49.     I closed on the purchase of Montecristo in August 2015.  There were different aspects of the close that occurred in August, September, October, and November 2015, from my getting shares in Side Coast's parent company, making the announcement to the community, taking over management of our dozens of staff, and swapping out directors in the parent company so the Plaintiff controlled it at the board level as well.  It's worth noting that for a number of months the Plaintiff paid the US $10,000+ per month in operational expenses for Montecristo's staff, security, payroll, food, electricity bills, maintenance of our cell phone tower, property maintenance, finance, and legal expenses.

50.     Mr. Arguello Pereyra is still the attorney for the Coastline brokers who have since gained all the Montecristo land, including all six neighborhoods and 8 kilometers of beach and ocean-front.

**PLAINTIFF'S VERIFIED LEGAL COMPLAINT FOR BREACH OF CONTRACT; EQUITABLE ESTOPPEL; BAD FAITH DENIAL OF INSURANCE CLAIM; and DECEPTIVE PRACTICES;**

51.     **The Coastline Brokers got title to Montecristo in a series of what the Plaintiff has recently confirmed must all be extrinsically fraudulent filings with Nicaraguan courts.**

52.     Fraud upon title is one of the occurrences in the Plaintiff's four title insurance policies.

53.     The Coastline brokers still have not returned his $100,000.

54.     The Plaintiff also lost $6250 in fraudulently-billed services to a First American Title-vetted Managua attorney that First American Title recommended as one of the few to be trusted with important transactions and title issue

55.     To preserve good order, the Plaintiff figured that Side Coast's attorney malfeasance claim should be (at least initially) adjusted and addressed separately from its claims under coverages (3), (6), (8), (9) and (12) that were previously tendered to First American Title Insurance Company.

**May 2021 Discovery of fraud upon title**

56.     The Plaintiff discovered in May 2021 that Coastline now owns Montecristo, and got title by making fraudulent claims in the Nicarguan courts.

57.     The Plaintiff, beneficial owner of the title insurance policies, filed claims within the required time frames of his policies in June 2021, triggering the duty to defend.

58.     The Plaintiff gathered materials as quickly as he could from a foreign company, and ultimately, in December 2021, formalizing his two inter-related claims with appropriate documentation.

59.     First American Title refused to defend the Plaintiff's company's real estate title.

60.     Thus, First America Title was required to pay the Plaintiff $3.6 million (the policy limits).

61.     In January 2021, FATI provided an initial denial of one of the claims.

14

**PLAINTIFF'S VERIFIED LEGAL COMPLAINT FOR BREACH OF CONTRACT; EQUITABLE
ESTOPPEL; BAD FAITH DENIAL OF INSURANCE CLAIM; and DECEPTIVE PRACTICES;**

62.     The Plaintiff and FATI corresponded about these issues, arguing about the duty to defend and the duty to indemnify, given the facts, but ultimately, FATI issued its final and complete denials of coverage in February 2022 (from memory).

63.     The Plaintiff has been left with no choice but to file this legal complaint to right the scales of justice.

64.     Under the Seventh Amendment to the United States Constitution, the Plaintiff has a right to a jury trial for his Constitutionally-protected petitioning rights.  (Also, as per *Fed. R. Civ. P 38(b)*).

65.     The Plaintiff hereby respectfully requests a jury trial on all issues raised herein, including all triable facts and issues related to his current causes of action and any facts, issues, requests, and/or causes of action that the Plaintiff or his future attorney may add within the timelines allowed by this Court.


## Count I – Breach of Contract (title policy, duty to defend)


65. The Plaintiff realleges paragraphs 1-65 as if fully set out herein.

66. The Plaintiff and Defendant First American Title entered into a series of valid, binding contracts (the four title insurance policies).

67. The Plaintiff fully performed, paying for the title insurance policies in full.

68. Defendant First American Title breached the Parties' contracts when it refused to defend the Plaintiff's real estate title as necessary in the policies.

69. First American Title's breach damaged the Plaintiff and was the proximate cause of his damages.

70. All allegations to be fully proven at jury trial including the amount of damages.

15

**PLAINTIFF'S VERIFIED LEGAL COMPLAINT FOR BREACH OF CONTRACT; EQUITABLE ESTOPPEL; BAD FAITH DENIAL OF INSURANCE CLAIM; and DECEPTIVE PRACTICES;**

## Count II – Breach of Contract (title policy, duty to indemnify)

65. The Plaintiff realleges paragraphs 1-65 as if fully set out herein.

66. The Plaintiff and Defendant First American Title entered into a series of valid, binding contracts (the four title insurance policies).

67. The Plaintiff fully performed, paying for the title insurance policies in full.

68. Defendant First American Title breached the Parties' contracts when it refused to pay the Plaintiff $3.6 million dollars after not defending the Plaintiff's title.

69. First American Title's breach damaged the Plaintiff and was the proximate cause of his damages.

70. All allegations to be fully proven at jury trial including the amount of damages.

## Count III – Breach of Contract (title policy, attorney malfeasance)

65. The Plaintiff realleges paragraphs 1-65 as if fully set out herein.

66. The Plaintiff and Defendant First American Title entered into a series of valid, binding contracts (the four title insurance policies).

67. The Plaintiff fully performed, paying for the title insurance policies in full.

68. Defendant First American Title breached the Parties' contracts when it refused to pay the Plaintiff $3.6 million dollars, denying the Plaintiff's insurance claim, after not defending the Plaintiff's title.

**PLAINTIFF'S VERIFIED LEGAL COMPLAINT FOR BREACH OF CONTRACT; EQUITABLE ESTOPPEL; BAD FAITH DENIAL OF INSURANCE CLAIM; and DECEPTIVE PRACTICES;**

66. The Defendant's denial of the Plaintiff's Claim was a material breach of the Policy as enhanced by the Murdock Coverage Interpretation, expressly covered attorney malpractice, malfeasance and misconduct.

67. Conjunctively and in the alternative, the Defendant's denial of the Plaintiff's Claim was a material breach of the Policy as enhanced by the Murdock Coverage Interpretation, impliedly.

68. As a proximate result of the Defendant's breach, the Defendant has suffered and will continue to suffer damages including a further $106,000 of base damages, before pre-judgment interest.

69. First American Title's breach damaged the Plaintiff and was the proximate cause of his damages.

70. All allegations to be fully proven at jury trial including the amount of damages.


## Count IV– Equitable Estoppel


61. The Plaintiff realleges paragraphs 1-65 as if fully set out herein.

62. Where an insurer refuses to extend coverage in bad faith, coverage by estoppel is one remedy extending to non-covered claims and to excess liability. *First United Bank v. First American Title Insurance*, 240 Nebraska, 640 (1993).

> Applying this test to the facts of this case, First United must first show that American Title had sufficient knowledge of facts or circumstances which would have indicated that First United's claim was not covered under the policy of title insurance issued by American Title. We first note that American Title seeks to impute knowledge of the existence of Southwest's lien to First United based upon a report by Record Data of Nebraska, Inc., an agent of American Title. It would seem reasonable, therefore, to impute the same knowledge to American Title. *United Bank* 240 Nebraska at 643.

63. In this case, the knowledge of First American's Director of Underwriting for Latin America, Murdock of the Murdock Coverage Interpretation would be imputed to First American. *If* attorney

17

**PLAINTIFF'S VERIFIED LEGAL COMPLAINT FOR BREACH OF CONTRACT; EQUITABLE ESTOPPEL; BAD FAITH DENIAL OF INSURANCE CLAIM; and DECEPTIVE PRACTICES;**

malpractice/misconduct claims were not in fact covered by the First American *then* First American would have sufficient knowledge of the facts and circumstances to establish that Ms. Murlock was extending coverage to this class of claims.

64. As a matter of black letter California law, the Defendant in this case should be estopped to deny coverage and subject to indemnify the insured to the full extent of the insured's losses.

## Count V – Bad Faith Denial of Insurance Claim

53. The Plaintiff realleges paragraphs 1-65 as if fully set out herein.

54. Defendants have put their own interests above those of Plaintiff and have, in bad faith, failed or refused to perform their obligations under the Policy and under the laws of California.

55. Defendants denied Plaintiff's claim in bad faith by, among other conduct,

(a) failing or refusing to perform a fair, objective, and thorough investigation of the claim

(b) asserting coverage defenses that were legally and/or factually invalid and thereby delaying resolution of Plaintiff's claim;

(c) placing unduly restrictive interpretations on the Policy terms for the purpose of denying coverage due under the Policy as enhanced by the Murdock Coverage Interpretation;

(d) failing to give Plaintiff's interests equal consideration with their own; and

(e) forcing Plaintiff to institute litigation to recover amounts due under the Policy. All these acts violate the relevant California Statutes which the Plaintiff is using for purposes of setting the relevant standard rather than implying a private cause of action. See *Jl Plaza's 93 v. Capitol Specialty*

18

**PLAINTIFF'S VERIFIED LEGAL COMPLAINT FOR BREACH OF CONTRACT; EQUITABLE ESTOPPEL; BAD FAITH DENIAL OF INSURANCE CLAIM; and DECEPTIVE PRACTICES;**

*Insurance Corporation*, 8:19 CV 184 (D. Nebraska October 3, 2019) and similar settled law in California.

56. Based on the above, Plaintiff alleges that Defendants have committed institutional bad faith that is part of a repeated pattern of unfair practices and not an isolated occurrence.

57. The pattern of unfair practices constitutes a conscious course of wrongful conduct that is firmly grounded in Defendants' established company policy.

58. That policy, among other things, markets policies in Latin America as covering attorney malpractice, but does not in fact extend coverage to attorney malpractice.

59. The Plaintiff's actual damages are over US $18 million, but his policy limits of only $3.6 million would have applied if the Defendant had not acted in bad faith.

60. All allegations to be fully proven at jury trial including the exact amount of damages.

## Count VI  -  Deceptive Practices & Unfair Competition

73. The Plaintiff realleges paragraphs 1-65 as if fully set out herein.

74. The Defendant First American has engaged in Deceptive Practices by conjunctively:

    (a) Authorizing or ratifying Murdock's dissemination of the Murdock Coverage Interpretation and/or;

    (b) disaffirming and/or repudiating the Murdock Coverage Interpretation.

75. Put more directly, Defendant First Ameican marketed First American policies to Latin American buyers by misrepresenting the category of claims it was willing to pay.

76. As a proximate result of the Defendant's deceptive and unfair practices, the Plaintiff has suffered and will continue to suffer damages.

19

**PLAINTIFF'S VERIFIED LEGAL COMPLAINT FOR BREACH OF CONTRACT; EQUITABLE ESTOPPEL; BAD FAITH DENIAL OF INSURANCE CLAIM; and DECEPTIVE PRACTICES;**

77. All allegations including the amount of damages to be fully proven at jury trial.

WHEREFORE, the Plaintiff prays:

    (a) As to Count I, for all damages proximately caused by the Defendant's breaches of contract and all consequential damages

    (b) As to Count II, for all damages proximately caused by the Defendant's breaches of contract and all consequential damages

    (c) As to Count III, for all damages proximately caused by the Defendant's breaches of contract and all consequential damages

    (d) As to Count IV that the Defendant be estopped to deny the duty to indemnify as a result of the Murdock Coverage Intepretation;

    (e) As to Count V, for an award of all damages caused by the Defendant's bad faith denial of the Plaintiff's claim as well as for the Plaintiff's consequential damages and emotional distress;

    (f) As to Count VII for all damages proximately caused by the Defendant's Deceptive Practices

RESPECTFULLY SUBMITTED

Carl A. Wescott, *pro se*
January 11th, 2024

**PLAINTIFF'S VERIFIED LEGAL COMPLAINT FOR BREACH OF CONTRACT; EQUITABLE ESTOPPEL; BAD FAITH DENIAL OF INSURANCE CLAIM; and DECEPTIVE PRACTICES;**

1
2

**VERIFICATION**

3    I, Carl A. Wescott, under penalties provided by California law as well as the federal laws of the
4    United States of America, certify that the facts set forth in this instrument are true and correct,
     except as to matters therein stated to be on information and belief and as to such matters the
5    undersigned certifies as aforesaid that he verily believes the same to be true.

6
7    _____

8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

**PLAINTIFF'S VERIFIED LEGAL COMPLAINT FOR BREACH OF CONTRACT; EQUITABLE ESTOPPEL; BAD FAITH DENIAL OF INSURANCE CLAIM; and DECEPTIVE PRACTICES;**

## EXHIBIT A: ASSIGNMENT OF SIDE COAST CLAIMS

WHEREAS, Side Coast, SA ("Side Coast"), is the owner of legal claims ("the claims")

COMES NOW, Side Coast, that hereby sets forth and agrees as follows:

1. For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, SIDE COAST hereby assigns all legal right, title, and interest it may have in the claims, to Carl A. Wescott ("Wescott").

2. SIDE COAST waives all right, title, claim and interest in these legal claims, whatever it or they may be, to Wescott free and clear of any claims of itself.

3. Wescott shall have all legal right and claim to the assigned legal claims. Wescott shall be afforded all legal rights and responsibilities pursuant to the legal claims as if he had been benefitting from the contracts with Defendants himself.

4. SIDE COAST makes no warranties or representations regarding the legal claims, and Wescott enters this Assignment after further review of the timeline and sequence of events.

5. Each party has had the opportunity to seek the guidance of an attorney of their own choosing in entering this agreement.

6. In witness whereof, the Assignor SIDE COAST and the Assignee Carl Wescott have both executed this assignment on the December 2023 date set forth below. The assignment shall be effectuated when both parties have signed.


_____
Assignor SIDE COAST
January 11th, 2024


_____
Assignee Carl Wescott
January 11th, 2024

1



 

**UNITED STATES POSTAL SERVICE** ®  |  **PRIORITY**® **MAIL**

## FLAT RATE ENVELOPE
ONE RATE ■ ANY WEIGHT

To schedule free Package Pickup,
scan the QR code.



USPS.COM/PICKUP

## TRACKED ■ INSURED



PS00001000014

EP14F July 2022
OD: 12 1/2 x 9 1/2

**VISIT US AT USPS.**
ORDER FREE SUPPLIES O

For Domestic shipments, the maximum weight is 70 lbs. For international shipments, the maximum weight is 20 lbs.